IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DIJANA BAJRAMOVIC,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:26-cv-1153<br><br>DISTRICT JUDGE<br>MICHAEL J. HENDERSHOT<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT & RECOMMENDATION** |

Plaintiff Dijana Bajramovic filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and disabled widow's benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In early 2024, Bajramovic filed applications for disability insurance benefits and disabled widow's benefits, alleging a disability onset date of

September 27, 2023.[1] Tr. 10, 205–06, 219. In her applications, Bajramovic claimed disability due to panic disorder, anxiety, panic attacks, insomnia, stroke, and heart conditions. Tr. 246. The Social Security Administration denied Bajramovic's applications and her motions for reconsideration. Tr. 94, 104. Bajramovic then requested a hearing before an Administrative Law Judge (ALJ). Tr. 128.

In May 2025, an ALJ held a hearing. Bajramovic and a vocational expert testified. Tr. 59–86. Later that month, the ALJ issued a written decision finding that Bajramovic was not disabled. Tr. 10–27. The ALJ's decision became final on March 16, 2026, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Bajramovic filed this action on May 18, 2026. Doc. 1. She asserts the following assignment of error:

> The ALJ violated Agency regulation by failing to properly evaluate the medical source statement provided by Dr. Flauto.

Doc. 6, at 2.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

**Evidence**

*Personal and vocational evidence*

Bajramovic was 52 years old on her alleged disability onset date. Tr. 25. She has a GED and used to work polishing machine parts in a factory. Tr. 69–70, 247.

*Relevant medical evidence*

In December 2023, Bajramovic saw her primary care doctor for depression and anxiety following her husband's then-recent death. Tr. 320. Bajramovic said that her psychiatrist had prescribed seven Xanax pills, and she asked for a refill. Tr. 320. Bajramovic was also taking Effexor for anxiety. Tr. 320. On exam, Bajramovic was alert and oriented and had a normal appearance. Tr. 321. She exhibited a normal mood. Tr. 321. The doctor diagnosed "bereavement counseling" and prescribed Vistaril. Tr. 321. The doctor advised Bajramovic that she should only get Xanax from one provider. Tr. 321.

Five days later, Bajramovic had a telehealth psychiatric appointment with David Feldman, MD. Tr. 404. Her symptoms were listed as "grieving." Tr. 404. Bajramovic reported that she didn't like taking Vistaril because it "knocked her out" and she would wake up crying. Tr. 404. She said that the Xanax cleared her head and was helpful when she took it. Tr. 404. Bajramovic reported that she was doing "great" on Effexor. Tr. 404. Dr. Feldman observed that Bajramovic was alert and "tearful/cries." Tr. 405. He diagnosed major

depressive disorder, recurrent, unspecified; and mild cognitive impairment of uncertain or unknown etiology. Tr. 404. Dr. Feldman refilled Bajramovic's Xanax prescription. Tr. 404–05.

In December 2023, Bajramovic followed up with cardiology for high cholesterol. Tr. 334. She reported some shortness-of-breath or "pinching" when she felt "anxious and crying due to recent loss of husband." Tr. 335.

In January 2024, Bajramovic followed up with Dr. Feldman. Tr. 406. She was accompanied by her emotional support dog. Tr. 406. Bajramovic told Dr. Feldman that she "avoid[ed] using her [X]anax [because] she felt very emotional after it one day." Tr. 406. Also, her daughter told her that Xanax was "poison," although Bajramovic said that it helped her sleep and concentrate. Tr. 406. Bajramovic took supplements to help her sleep, but her sleep was "not good" and she felt "panicky in bed." Tr. 406.

In March 2024, Bajramovic followed up with Dr. Feldman. Tr. 408. Bajramovic presented as calm and cooperative, with normal grooming and hygiene. Tr. 408. She displayed normal speech and affect, "ok" insight and judgment, and goal-directed and logical thought processes. Tr. 408. Bajramovic's mood was "tearful," and, for her memory and concentration, Dr. Feldman wrote that Bajramovic stated that she often misplaced her eyeglasses. Tr. 408. Bajramovic said that she was selling her condo and processed having to move in with her mother and sister, which she expressed concern about. Tr. 409. She continued taking Effexor and Xanax. Tr. 408–09.

In May 2024, Bajramovic saw Natalie Whitlow, PhD, for a psychological consultative exam. Tr. 380. When asked why she applied for disability, Bajramovic reported that she had "huge panic attacks" that kept her from working. Tr. 381. She also said that she has had two strokes in the past, and if she stands too long at work, she starts to feel numbness in her body and she panics that she's having a stroke. Tr. 381. Dr. Whitlow commented that, even when pressed, Bajramovic could not say how often she had panic attacks that interfered with her ability to work, and that Bajramovic said that they "correlated to the recent stressor of her husband's death." Tr. 381. Bajramovic reported that she took her prescribed medications, Effexor and Xanax, and said that they helped—she cried less, slept better, she can get up and do things, and the medications calmed her "panicky." Tr. 382.

On exam, Bajramovic's speech and thought process were normal. Tr. 384. Her affect was sad and depressed "but assessed to be appropriate, as her affective state was consistent with the topic of the conversation that was being discussed." Tr. 384. Bajramovic showed no signs of anxiety and she was oriented to person, time, and place. Tr. 384. She exhibited fair insight and fair-to-poor judgment. Tr. 385. Dr. Whitlow found that Bajramovic appeared to possess average cognitive functioning. Tr. 384. She diagnosed Bajramovic with persistent depressive disorder "with Anxious Distress, Grief Related." Tr. 385. Dr. Whitlow concluded that Bajramovic "did not provide sufficient evidence to warrant concluding that she experiences severe, persistent, or debilitating"

limitations in the functional areas regarding understanding, remembering, and carrying out instructions; attention, concentration, persistence, and pace; responding appropriately to supervisors and co-workers; and responding to work pressures. Tr. 387.

In June 2024, Bajramovic followed up with Dr. Feldman. Tr. 410. Bajramovic's symptoms were "grieving" and her functional status was "difficult." Tr. 410. Bajramovic said that she didn't feel like she was getting better and remained upset about her husband's death. Tr. 411. She had to push herself to eat, go out with her dog, and shower. Tr. 411. She felt calmer when taking her medication. Tr. 411. Bajramovic said that she experienced no joy and felt hopeless about the future. Tr. 411. She had no active suicidal ideation but stated that she sometimes didn't care if she died. Tr. 411. On exam, Bajramovic was calm and cooperative with normal grooming and hygiene. Tr. 410. She displayed normal speech and affect, "ok" insight and judgment, and goal-directed and logical thought processes. Tr. 410. Bajramovic's mood was "tearful" and she again stated that she often misplaced her eyeglasses. Tr. 410.

The next day, Bajramovic saw Dorothy Bradford, MD, for a physical consultative exam. Tr. 398. Dr. Bradford noted that Bajramovic was alert and oriented and exhibited an appropriate effect. Tr. 399.

In July 2024, Bajramovic told Dr. Feldman that she was not good, and that she was having the worst day of her life. Tr. 412. Bajramovic said that other than times that her adult children were around, she had no strength,

desire, or happiness. Tr. 412. Her disability application had been denied and she did not understand why. Tr. 412. Bajramovic described feeling panicked when she left home—the Xanax helped her "go places" but it had lost its efficacy. Tr. 412. Bajramovic's exam findings were the same as her prior visit, except that she cried silently throughout appointment. Tr. 412. Dr. Feldman diagnosed major depressive disorder, mild cognitive impairment of uncertain or unknown etiology, and agoraphobia with panic disorder. Tr. 412. He increased Bajramovic's Xanax prescription. Tr. 413.

In October 2024, Bajramovic underwent a diagnostic evaluation with Licensed Professional Clinical Counselor Phillip Flauto "for therapy to deal with the death of her husband." Tr. 427. On exam, Bajramovic had a depressed mood and a tearful affect. Tr. 429. She was in no acute distress and had appropriate grooming and hygiene. Tr. 429. Bajramovic exhibited normal speech, intact associations and memory, and "focused" attention and concentration. Tr. 429. She had good insight and unimpaired judgment. Tr. 429. Flauto diagnosed major depressive disorder, recurrent, severe, without psychotic features and panic disorder. Tr. 429. Bajramovic returned a week later for therapy. Tr. 431. Her exam findings were the same as her prior visit except that her mood was anxious rather than depressed. Tr. 431.

In late October 2024, Bajramovic followed up with Dr. Feldman. Tr. 416. She said that she rarely went anywhere by herself and was experiencing flashbacks of her husband's death. Tr. 417. Dr. Feldman prescribed an

additional medication. Tr. 416–17. The next day, Bajramovic saw Flauto for therapy. Tr. 433. At this and the next three visits, Bajramovic's exam findings mostly remained the same: a depressed mood; no acute distress; appropriate grooming and hygiene; normal speech; intact associations and memory; good insight; and unimpaired judgment. Tr. 433–34, 435–36, 437–38, 439–40. During one November visit her affect was full and appropriate, Tr. 437, and at others her affect was tearful, Tr. 433, 435, 439.

In December 2024, Bajramovic saw Flauto five times. At these visits she had a depressed mood. Tr. 442, 444, 446, 448, 450. At four of the visits she had a tearful affect, Tr. 444, 446, 448, 450, and at one of the visits she had a full and appropriate affect, Tr. 442. Her remaining unremarkable exam findings were the same as her prior visits. Tr. 442–43, 444–45, 446–47, 448–49, 450–51.

In January 2025, Bajramovic saw Dr. Feldman and said that she was panicky every day. Tr. 418. She felt lost and had no desire to see people other than her children, although if she "had the means" she would visit family and friends in Croatia. Tr. 419. Bajramovic reported back pain, a poor appetite, and weight loss. Tr. 419. On exam, she was calm and cooperative, with normal affect and a goal-directed, logical thought process. Tr. 418. Her memory and concentration felt "off" and she was tearful and cried. Tr. 418.

Bajramovic continued to see Flauto in January and February for therapy, and her exam findings remained similar to her prior visits. *See, e.g.*, Tr. 452, 454, 457, 459, 461, 463, 465.

March 7, 2025, Flauto completed a medical source statement on Bajramovic's behalf.[2] Tr. 422–24. The form asked Flauto to grade Bajramovic's level of work limitations in three areas of mental functioning: social interaction; sustained concentration and persistence; and adaption. Tr. 422–24. Flauto opined that Bajramovic had "extreme" or "marked" limitations in every area of mental functioning. Tr. 422–24. He also wrote that Bajramovic would experience unscheduled work absences and that she had days when her symptoms were "completely debilitating and she is unable to function." Tr. 424.

On March 12, 2025, Bajramovic told Flauto that she had "enjoyed [the] better weather." Tr. 468. She said that she often felt lonely and sad, and although thinking about her husband's death was "still not great," she felt less emotional about it. Tr. 468. Bajramovic's exam findings were similar to those at prior visits: a depressed mood; tearful affect; no acute distress and appropriate grooming and hygiene; normal speech; intact associations and

[2] The form was "prepared and sent" to Flauto by Bajramovic's counsel. Tr. 424. This is perhaps why the heading of the form lists the "Treating Source" as "Dr. Phillip Flauto LPCC-S," Tr. 422, and Bajramovic persists in referring to Flauto as "Dr. Flauto," *see* Doc. 6, at 2, 6, 10. There is no indication in the record however that counselor Flauto is a doctor.

memory; goal-directed and organized though processes; focused concentration; good insight; and unimpaired judgment. Tr. 468–69.

On March 19, Bajramovic's mood was better—euthymic,[3] with a full and appropriate affect—and she said that she hoped to travel to Croatia in the summer. Tr. 470. On March 26, she had a sad mood, but a full and appropriate affect. Tr. 472.

*State agency opinions.*[4]

In May 2024, Audrey Todd, PhD, reviewed Bajramovic's record and found that Bajramovic's psychological conditions were not severe. Tr. 90–91.

In August 2024, Cindy Matyi, PhD, reviewed Bajramovic's record. Tr. 95–100. Dr. Matyi found that Bajramovic's psychological conditions were severe. Tr. 98. Regarding Bajramovic's mental residual functional capacity (RFC),[5] Dr. Matyi found that Bajramovic could "remember and understand

---

[3] A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

[4] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5] An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's

sufficiently" and "concentrate and persist sufficiently" to carry out simple tasks and, occasionally, detailed tasks. Tr. 101. Bajramovic could "relate with others in an environment that entails infrequent and superficial public contact." Tr. 101. And Bajramovic could "adapt to a setting in which duties are routine and predictable and in which changes are infrequent, explained in advance, and introduced slowly." Tr. 102.

*Hearing testimony*

Bajramovic, who was represented by counsel, testified at the telephonic administrative hearing held in May 2025. Bajramovic stated that at the time of the hearing she lived with her mother and sister. Tr. 64. She could drive but did so "barely," only on her "best days," to the pharmacy or grocery store. Tr. 66. Otherwise, Bajramovic has trouble leaving the house. Tr. 66. When she leaves her house, she takes her dog with her. Tr. 66.

Bajramovic said that she was fired from her factory job because she had problems getting along with others. Tr. 72–73. Also, she would leave the job for a month, time-to-time, due to her health, and her employer didn't like that. Tr. 72–73. When asked why she hasn't worked since she was fired, Bajramovic said that she has trouble going out by herself. Tr. 73. When she goes out alone, she feels panicky, anxious, and lost, and then she has to take her medicine. Tr. 73. After she takes her medicine, she has to lie down for a little bit. Tr. 73. The

"description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

medicine makes her feel drowsy and sleepy. Tr. 78. Bajramovic stated that she takes Effexor and Xanax, which helps calm her down and improves her feelings of panic. Tr. 74.

The ALJ discussed with the vocational expert Bajramovic's past work as a polisher. Tr. 80. The ALJ asked the vocational expert to determine whether a hypothetical individual such as Bajramovic could perform Bajramovic's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 80–81. The vocational expert answered that such an individual could not perform Bajramovic's past work, but could perform the following jobs: hospital cleaner, store laborer, and packer operator. Tr. 81.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.
>
> 2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.
>
> 3. The prescribed period ends on November 30, 2030.
>
> 4. The claimant has not engaged in substantial gainful activity since September 27, 2023, the alleged onset date (20 CFR 404.1571 *et seq*.).

5. The claimant has the following severe impairments: depression, anxiety, and neurocognitive disorder (20 CFR 404.1520(c)).

6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

7. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember and carry out simple instructions; can have occasional interaction with the public; and can deal with occasional changes in a routine setting.

8. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

9. The claimant was … 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

10. The claimant has at least a high school education (20 CFR 404.1564).

11. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is “not disabled,” whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12. Considering the claimant’s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

> 13. The claimant has not been under a disability, as defined in the Social Security Act, from September 27, 2023, through the date of this decision (20 CFR 404.1520(g)).

Tr. 13–27.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Bajramovic argues that the ALJ failed to properly evaluate Flauto's opinion. Doc. 6, at 2.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5).

Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* (citing § 404.1520c(b)(2)).

As an initial matter, Bajramovic asserts that Flauto "was treating … Bajramovic on a regular basis for the past two years; thus, he was the best physician to describe … Bajramovic's abilities and conduct this evaluation." Doc. 6, at 11. Bajramovic has not shown that Flauto treated her for two years before he rendered his opinion. Indeed, the first appointment with Flauto that Bajramovic mentions in her brief is an October 15, 2024 diagnostic evaluation, Doc. 6, at 6 (citing Tr. 426–27), and the next reference is an October 22 therapy session, *see* Doc. 6, at 6 (citing Tr. 431). These are Bajramovic's first

appointments with Flauto. *See, e.g.*, Tr. 416 (Dr. Feldman referencing on October 28, 2024, that Bajramovic had seen Flauto "twice"). Flauto's opinion is dated March 7, 2025. Tr. 424. This is a five-month treatment period, not a two-year treatment period.

In any event, to the extent that Bajramovic believes that her treatment relationship with Flauto, in any form, somehow renders faulty the ALJ's evaluation of the supportability and consistency factor, *see* Doc. 6, at 12, she cites no legal authority for her assertion. The length of treatment is a separate factor that an ALJ considers when evaluating opinion evidence. *See* 20 C.F.R. § 416.920c(c) (discussing the five factors the ALJ considers when evaluating opinions, including "(1) Supportability," "(2) Consistency," and the provider's "(3) Relationship with the claimant," including the length and frequency of the treatment). The ALJ is not required to discuss the treatment relationship, *see* § 416.920c(b)(2), and Bajramovic hasn't shown that the ALJ failed to consider it.[6]

---

[6] Bajramovic's mistaken reference to Flauto as a doctor and her heavy reliance on the length-of-treatment factor suggests that she may be attempting to implicate what used to be known as the *treating physician rule*. This rule required ALJs to defer to opinions provided by treating *acceptable medical sources*, like doctors, and was "based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]" *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)); *see also* 20 C.F.R. § 404.1502 (effective June 13, 2011 to March 26, 2017). The *treating physician rule* hasn't been in effect since 2017, *see* 20 C.F.R. § 416.920c, and it doesn't apply here.

The ALJ discussed Flauto's opinion and evaluated it as follows:

> Phillip Flauto, a Licensed Professional Clinical Counselor (LPCC), and the claimant's own medical source completed a Mental Medical S[]our[ce] Statement as to Ability to Perform Work-Related Activities on the claimant on March 7, 2025 (Exh. 10F/1). Mr. Flauto determined that the claimant had extreme limitations in the following areas: her ability to accept instruction from or respond appropriately to criticism from supervisors or superiors; respond appropriately to coworkers or peers; her ability to perform and complete work tasks in a normal work day or workweek at a consistent pace; process subjective information accurately and to use appropriate judgment; perform at production levels expected by most employers; behave predictably, reliably and in an emotionally stable manner; and tolerate customary work pressures (Exh. 10F/1-3). He further determined that the claimant had marked limitations in the following areas: work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; her ability to relate to the general public and maintain socially appropriate behavior; work in cooperation with or in proximity to others without being distracted by them; carry through instructions and complete tasks independently; maintain attention and concentration for more than brief periods of time; respond appropriately to changes in a work setting; remember locations, workday procedures and instructions; be aware of normal hazards and take necessary precautions; and maintain personal appearance and hygiene (Exh. 10F/1-3).
>
> I find this opinion not persuasive, as it is not supported by the medical evidence. During multiple psychotherapy appointments, Mr. Flauto noted during the claimant's mental status exams, the claimant had appropriate grooming and hygiene (Exh. 12F/4, 6, 8, 10, 12, 14, 17, 18). Additionally, he indicated that the claimant had marked limitations

> in her ability to maintain attention and concentration for more than brief periods of time; however, during multiple mental status exams, it was noted that her attention and concentration were both focused (Exh. 12F/4, 7, 9, 11, 13, 15, 18, 20).
>
> Furthermore, this opinion is inconsistent with other evidence in the record, which showed during a Psychological Consultative Examination, the claimant was alert and attentive and was coherent with her communication (Exh. 5F/6). She was oriented to person, place, time and event. She was able to answer questions, such as her name, where she was presently living, and the current year (Exh. 5F/6). She was able to perform simple multiplication problems with no errors (Exh. 5F/7). This evidence is inconsistent with the counselor's findings and justifies limiting the claimant to understanding, remembering and carrying out simple instructions; can have occasional interaction with the public; and can deal with occasional changes in a routine setting.

Tr. 23–24.

*1. Supportability*

Bajramovic first challenges the ALJ's evaluation of the supportability factor. Doc. 6, at 12. She states:

> The ALJ based its conclusion on Dr. Flauto's mental status exam and on a standard psychological consultative exam, instead of what was recorded throughout Ms. Bajramovic's treatment.... The ALJ neglected to consider Dr. Flauto's opinions and Ms. Bajramovic's statements made throughout her office visits, explaining Ms. Bajramovic's limitations. Tr. 428. Therefore, the ALJ failed to adequately explain why Dr. Flauto's opinion was not persuasive when considering the residual functional capacity.

*Id.* Bajramovic's claim that the ALJ "neglected to consider … Flauto's

opinions," *id.*, is belied by the ALJ's decision quoted above, in which the ALJ recited and considered Flauto's opinions, Tr. 23–24.

In support of her claim that the ALJ "neglected to consider … Bajramovic's statements" that she made to Flauto "explaining [her] limitations," Bajramovic summarizes portions of her treatment records with Flauto. Doc. 6, at 12–13. Her summary includes evidence that she failed to cite in the *Facts* section of her brief, in violation of this Court's Initial Order. *See* Doc. 3, at 3–4 ("Any facts recited in support of the *Argument* or *Analysis* section of a brief must also be set forth in the *Facts* section of the brief. The Court will not consider facts referenced in a party's argument unless those facts have been set out in the *Facts* section of the party's brief."). So the Court need not consider the facts that Bajramovic improperly relies on.[7]

Even if the Court were to consider these facts in support of Bajramovic's argument that the ALJ failed to consider the statements and purported limitations she described to Flauto, Bajramovic has not shown that the ALJ erred. She hasn't provided legal authority indicating that an ALJ must evaluate the statements claimants make to their providers when evaluating

---

[7] The evidence that Bajramovic failed to include in the *Facts* section of her brief includes details of her statements to Flauto, Doc. 6, at 12 (Bajramovic "stating that she had guilt from her husband's death, which caused her stress, and was in an abusive first marriage for 24 years, which developed her depression and anxiety").

the supportability factor—or any factor.[8] In fact, "[r]egardless of any inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion." *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016). The ALJ cited Bajramovic's exam findings during Flauto's exam, Tr. 23, which is an appropriate factor to rely on when evaluating the supportability of an opinion. Indeed, it is the very definition of *supportability*. *See* 20 C.F.R. § 416.920c(c)(1) (defining *supportability* as "[t]he more relevant the *objective medical evidence* … presented by a medical source are to support his or her medical opinion(s) the more persuasive the medical opinions … will be") (emphasis added).

Next, Bajramovic points out that she consistently presented to Flauto with a depressed mood. Doc. 6, at 13. But this fact doesn't undercut the ALJ's finding that Flauto's opinions—that Bajramovic would be extremely and markedly limited in all of the seventeen areas of functioning the form covered—was not supported by Bajramovic's objective exam findings. Tr. 23. Elsewhere in the decision, the ALJ recognized that Bajramovic often presented with a depressed mood. But, the ALJ noted, despite this Bajramovic also presented with appropriate grooming and hygiene, and she was in no acute distress, alert and oriented with intact associations and memory, she had goal-

---

8 An ALJ is required to evaluate the claimant's reports of symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. The ALJ did so here, Tr. 15–16, and Bajramovic has not challenged this aspect of the ALJ's decision.

directed and organized thought processes, focused attention and concentration, unimpaired judgment, and good insight. Tr. 19–21. Bajramovic's disagreement with the ALJ's conclusion is not a reason to reverse the ALJ's decision.

Bajramovic submits that she "has an emotional support dog…that she takes everywhere with her." Doc. 6, at 13. She then pivots to the administrative hearing, in which, she claims, the vocational expert testified that a worker's need for an emotional support dog would be an accommodation that would "preclude that individual from work." *Id.* (citing Tr. 83). The vocational expert did not testify that a worker's need for an emotional support dog would preclude the individual from work. Tr. 83. Bajramovic concludes that the "necessity of an emotional support animal would preclude [her] from work, which supports … Flauto's findings in his medical statement." *Id.* (citing Tr. 422). But Flauto did not opine that Bajramovic needed an emotional support animal.[9] Tr. 422–24. Bajramovic's attempt to invent such an opinion is not well-taken.

In her reply brief, Bajramovic makes new arguments. She contends that the ALJ only cited two reasons why Flauto's opinion was unsupported, and that this "consideration" was "limited" and therefore "insufficient." Doc. 9, at 1. Bajramovic also asserts that "[t]he fact [she] could dress appropriately or

---

[9] The record indicates that Bajramovic was not permitted to bring her dog to therapy appointments with Flauto. *See* Tr. 419 (Dr. Feldman noting that Bajramovic "can't take [her dog] there" to "weekly therapy with sam[e] therapist.").

maintain focus for a couple days a month for a very limited time period does not mean that she would not have significant issues with those same tasks during an 8-hour day, 5 days a week." Doc. 9, at 2. Bajramovic could have, but did not, make these arguments in her opening brief. She has therefore forfeited them. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) ("Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it was not raised in the opening brief.'") (citation omitted)). Even if the Court were to consider Bajramovic's improperly raised arguments, Bajramovic hasn't cited legal authority describing how many reasons an ALJ must cite when evaluating the supportability of an opinion. And she doesn't explain why she believes the ALJ erred by relying on objective exam findings when the regulations expressly advise the ALJ to do so. *See* 20 C.F.R. § 416.920c(c)(1).

Finally, Bajramovic lists other evidence in the record that she believes supports Flauto's opinions. Doc. 6, at 14–16. But "other evidence" is relevant to the consistency factor, not the supportability factor. *See* 20 C.F.R. § 416.920c(c)(2). I consider Bajramovic's consistency arguments next.

*2. Consistency*

When discussing the consistency factor, Bajramovic complains that the ALJ "solely focused on the mental status exams" from Flauto's appointments. Doc. 6, at 17. But when the ALJ discussed the consistency of Flauto's opinions, she did not rely on the mental status exams from Flauto's visits. Tr. 24. Rather,

the ALJ cited the mental exam findings made by consultative examiner Dr. Whitlow. Tr. 24. This is "evidence from other medical sources" on which the ALJ was permitted to rely. *See* 28 U.S.C. § 416.920c(c)(2).

Bajramovic argues that the statements she made to Dr. Whitlow were consistent with statements she made to other providers. Doc. 6, at 17–18. It's not clear what Bajramovic is attempting to do here. Bajramovic has not challenged the ALJ's evaluation of Dr. Whitlow's opinion or any opinion in the record other than Flauto's. She hasn't challenged the ALJ's evaluation of her reports of symptoms. And she hasn't cited legal authority showing that the ALJ was required to discuss statements that Bajramovic made to other providers when evaluating the consistency of Flauto's opinion.

Bajramovic points out that the ALJ found Dr. Whitlow's opinion persuasive, and reasons that because Bajramovic conveyed to Dr. Whitlow and Dr. Feldman "the same emotions" she conveyed to Flauto, Flauto's opinion was consistent with Dr. Whitlow's and Dr. Feldman's opinions. Doc. 6, at 17–18. Not so. Dr. Whitlow opined that Bajramovic's exam didn't warrant any limitations in work functioning, Tr. 387, whereas Flauto opined that Bajramovic would have extreme and marked limitations in all areas of work functioning, Tr. 422–24. Dr. Feldman's letter didn't list any limitations at all, Tr. 421, as the ALJ noted, Tr. 23. And Bajramovic has not challenged the ALJ's evaluation of Dr. Whitlow's opinion or Dr. Feldman's letter. She has not shown that the ALJ erred when she discussed the consistency of Flauto's opinion.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: November 6, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).